Chief Judge Smith and may it please the court, it's a privilege to represent Mr. Bell in this case. As a young black male, he is more likely to be stopped demographically, more likely to be improperly detained, more likely to be wrongfully arrested, and more likely to be falsely imprisoned and jailed. This case shines a bright light on how that happens on constitutional policing practices and why it continues misapplication of the qualified immunity doctrine. As Justice Thomas complained in 2017 in Ziegler v. Abbasi, QI principles have been completely reformulated and no longer embody the common law made applicable in 1871 by the enactment of what is now section 1983. The district court misapplied qualified immunity in this case. Instead of viewing the facts in the light most favorable to Mr. Bell, the non-moving party, it found facts, it noted facts, or it considered facts. It found that Bell could have been breathing normally after running a seven-minute mile in the summer where, contrary to a more reasonable inference, it noted that he was of similar height, weight, and body type when the dissimilarities far outweighed the similarities as we've detailed in our brief. And it considered that in the summer, he shed layers of clothing in order to justify the vast discrepancy between his appearance. As you will see in the addendum to the brief, the white on his shorts are as extremely noticeable as just one example compared to on the next page. These are pages, I think, 26 and 27. The suspect, a screenshot from the video shows a slim 5'10 kid running with what was described as blue shorts and absolutely no white available. Well, let me ask you this. So one of the things is the video was very grainy. I mean, I took a close look at that screenshot and really studied it, and it's hard to make out. I mean, it's just not clear. What do we make of that? Well, in some respects, it's hard to look at. If you look carefully, the TV looked carefully at it sitting at his desk three weeks later, and he noticed you could tell the difference in the socks height, the difference in the dreads. But what is easily noticeable watching it two or three times, and the officers claim they watched it at least twice, is that that white stripe, that big, huge white thing is not available. You can see the kid running, and while the video is somewhat grainy, that white stripe is just absolutely not there. And that photograph of Bell that's in the addendum was taken by the police when they had him stand outside the police car while he's there. And that's just one of the many discrepancies that applied in this case. The height, 5'10 versus 6'3. Well, counsel, what you're describing thus far indicates the police were mistaken, certainly, and they even admitted as much by eventually recommending that the charges be dismissed. What indicates in this case that there's something beyond the level of mistake for which qualified immunity would apply to something greater than that that it wouldn't protect against? The mistake must be objectively reasonable. And Judge Colleton wrote in Johnson v. McCarver back in November that what is objectively reasonable is what there's a fair probability of. Was there a fair probability he did this? And the problem in this district court is that the district court did this backwards. It looked at these facts and it noted or it considered and it found justification for all the mistakes that were made, like shedding clothes in order to account for the difference in the coloration of the shorts, that while a kid is running a 7-minute mile, he's not only taking his shoes off and putting his shoes back on, he's also shedding clothes which were never found. So the question is, was it objectively reasonable to make all of these contrary assumptions? Was it when you look at this record, was there a fair probability that you got the right guy? And it's, they didn't. They got the wrong guy. And if you'd looked, if the district court had looked at the facts and made the reasonable inferences, he would have been breathing heavily if he'd run a 7-minute mile in the summer. Those kinds of facts and reasonable inferences, there would not have been probable cause for the arrest. And the state, the police do not look for probable cause where prudent is acting to prevent avoidable harm. Here there were all kinds of flags going off to prevent avoidable harm. So if the trial court had made factual findings based on the record, not these considerations that were used to justify after the fact the mistake, then they would have said this mistake led to an arrest without probable cause because a prudent officer seeking to avoid harm would not have made all of these. There were the 14 mistakes that we did. And the Supreme, this is an exact violation of the Supreme Court's warning in Tolan that you have to be careful not to import into your fact findings a context that is different. Here they, here the district court imported into its fact findings that this was the guilty suspect, finding the facts in a way that were contrary to the record. And by importing that, he imported contested facts that should have been found the other way. To add to Chief Judge Smith's question, you just cited a Supreme Court case, but I want to give you another one, which is Hill v. California, which basically says that when there's a reasonable mistake in your restaurant party, that doesn't mean it's not a valid arrest. Now, slightly different situation. But what do you make of that, both in terms of your argument, Judge Smith's question, and then also the clearly established right point? Sure. So it's, when you view the facts in the light most favorable in this case, the objectively reasonable standard, it doesn't apply here. Using the fair probability measure of what that means, in this case, there was clearly a harm. They got the wrong guy. And if you try to justify getting the wrong guy, you're doing it backwards, instead of if you're finding the facts and then applying the probable cause. Now, was it clearly established? Well, it's been clearly established you can't arrest the wrong guy. The defendants don't really contest that, that you have that. There's not a constitutional claim every time you make a mistaken arrest, is there? No, no, it's not. But it is if, as Judge Gibson wrote in Keel v. Burgess, if there is, even though there's inculpatory evidence available at the time that would support probable cause, if there is also exculpatory evidence reasonably at hand, you must consider it. You can't just walk away from it. Here we had two eyewitnesses who could have identified that they had the wrong guy. The descriptions didn't fit. The physical conditions didn't fit. It was not an emergent situation. Bell was held there in the police car for over an hour. They had plenty of time to do the reasonable suspicion investigation that would have been warranted. It was clearly established under Keel, under, the state does not contest that the, that there was this probable cause issue. But didn't the officers view the video, I think, over the course of at least an hour or two, eight times? I mean, that's, it's not as if they viewed it once, made, you know, made the, made the identification and said, okay, we're not looking at that ever again. Well, that's contested. We acknowledge that they did at least twice. We don't know whether they looked at it for your few seconds or how much they looked at, but, but, but looking at that's not, if you look at it and you don't consider what you're seeing, if you don't consider those white stripes on the short and you don't ask the kid that's sitting right there in handcuffs or the calling party, who's right around the corner, who identified them, who've all said in their declarations, if they'd only asked me, I would have told them they had the wrong guy. All that was reasonably at hand. And officer Vieselman, who was acting, who's, who's objectively reasonable, it seems he's the one who stopped Mr. Bell and said, and radioed to the arresting officer, are you sure he took his shoes off? He's not, he's breathing pretty normally and questioning whether or not, and telling Mr. Bell and it's in the transcript. Yeah. Yeah. You're going to be out of here really fast. Vieselman looking at the evidence available and saw the mismatch acted objectively reasonable, but, but Munyon made this snap eyewitness show up identification in about six seconds from 30 feet away through the windshield of his car. And this, the inherent fallibility of eyewitness identifications is not even argued. We've, we've, we raised that extensively on our brief and the police have not even mentioned it. Uh, to my view, they've defaulted on that issue. They've abandoned the issue about whether this eyewitness identification by Munyon was inherently fallible from the beginning. Let me ask you this. So we, we, I think there's no question there's some shoddy police work here. There is. But the problem I'm still having with your argument is you, you cited the previous case about not ignoring exculpatory evidence. The Supreme Court has been very clear that you need more specificity, that we don't look at qualified immunity based on abstract principles of law. And my problem is, is I can't find a single case in your brief or elsewhere that suggests that a mistake like this is actionable under section 1983 and constitutes a constitutional violation. Well, you know, from Holt versus Pelzer to just recently this court, ZJ versus the Kansas City Board of Police Commissioners said you don't have to find a case that's right on point, that, that fair notice is sufficient even in the absence of a case on, on, on point here. And certainly there's fair notice about the fallibility of eyewitness identifications have been noted for 40 years. It's in your model criminal instructions 4.08. Um, and the, um, um, um, in the, in the, in the, in the Supreme Court, the Supreme Court in the city of Canton and 1989, I know my time's running out and I'm probably not going to leave much for rebuttal, but that the city of Canton case, the Supreme Court wrote about the commissioners and the chief note to a moral certainty that there will be occasions on which eyewitness identification will play a role in whether or not there's probable cause for arrest. That's the need to train officers in the constitutional limitations of probable cause and the role that the reliability of eyewitness identification plays and whether or not there is probable cause for an arrest can be so obvious that to ignore it would be deliberately indifferent to constitutional rights. So what happened after the, uh, arrest scene when it went to court, was there a county attorney involved at that point? Um, there were, and a judge, there were probable cause hearing. Well, yeah. How come, how come this wasn't straightened out at that point? No, it was when it, when it first, the day before the first hearing, um, um, a TV reported that he had looked preparing for the hearing. He'd looked at it. I know that, but he was held 21 days as I understand. Okay. So there wasn't there a hearing earlier? There was an arraignment and then, then there was a hearing date that was postponed. Um, and the court and the, so it was twice postponed to a hearing date, three, three weeks later. So they're never, why was it postponed twice? Um, yeah, I'm not sure. I don't know whether, uh, uh, I know that Mr. Bell's late mother came and was pleading with the court not to, uh, uh, not to continue the matter and to look at the, um, uh, at the videotape. So I'll reserve what little time I have left. Thank you, Your Honor. Thank you, Mr. Benson. Mr. Reed. Um, judges and may have pleased the court, Peter Reed for the officers and other state defense. Qualified immunity gives officers ample breathing room for mistaken judgments and protects all but the plainly incompetent. Here, the arrest was valid and based on probable cause and eyewitness identification. But I'd like to start with Judge Colleton's last question. What eyewitness are you talking about? Officer Munion, Your Honor. Uh, I would like to start with Judge Colleton's last question, which is what happened after, um, the, the scene of the crime. Um, cause I think it's extremely important and relevant here. Um, immediately the guiding principle here is qualified immunity and not probable cause. Within 48 hours of Mr. Bell's arrest, there was a probable cause hearing before a neutral magistrate and neutral magistrate found that the officer's judgment was in fact based on probable cause. That undisputed fact under the qualified immunity standard. How did that happen? I mean, why couldn't it get straightened out at that point? So the man doesn't have to stay in custody for 21 days. Wasn't there a county attorney and a judge who could have straightened this out? Yes, Your Honor. There absolutely was a county attorney there and Mr. Bell's counsel was there as well. Um, but there were the, were these pictures viewed and was the issue raised about identity? I don't know if the stills were here. I think the issue about identity certainly was raised and what you had was quite a bit of, um, look, there's a lot of factors here that pointed, uh, that supported officer Munion's judgment on the scene. Um, what you have later on, um, is this development. What supported, what supported the identification? So I think there are at least five factors that supported the, uh, identification. We have officer Munion's eyewitness identification. He sees the suspect. You'll, you'll watch the video and I encourage you to watch the video. It's exhibit T, um, to the motion for summary judgment. Pull up, the suspect turns, looks at the car, takes off running. Officer Munion chases him. He's the one who gives the radio dispatch description to, um, to dispatch. Um, he chases the suspect and when he, um, and when Mr. Bell, um, was arrested, um, he sees, um, or he sees the arrestee, Mr. Bell, um, and identifies him as the suspect. Were the, were the details of the viewing discussed at all or how far away he was? Was there anything in between what, any way to examine what Munion was looking at the two times he says he saw the suspect? Yes, absolutely. Your honor, there was, um, so there were about 10 minutes, uh, had elapsed from when, uh, well, seven minutes had elapsed from when officer Munion lost track of the suspect and when, um, uh, Mr. Bell was detained and it was a few minutes later, uh, that officer Munion came and identified, um, Mr. Bell. This was not a quick two minute process. They detained Mr. Bell. They went back and watched the video multiple times, um, both at the scene and later at juvenile detention. Is that disputed though? Opposing counsel makes the point that no, it's disputed. They only maybe watched it twice, not eight times. Your honor, I, I see no basis in the record to dispute that fact. Um, you can look at the log record for the video. It's at JA 109, um, that was watched eight times on the record. There's no evidence to the contrary. What do you make of the arguments of, uh, opposing counsel that the judge was finding facts, uh, in comparing the descriptions in the ultimate appearance of, uh, Mr. Bell? Your honor, I don't think the district court engaged in improper fact finding here at all. And there's an important distinction to be made here, especially in the context of a probable cause hearing between predicate facts and the reasonableness judgment of the officer. Um, so this court has explained this distinction several times, um, in White v. McKinley, which the district court discusses and in Pace v. Des Moines, um, which is discussed in the White case. And in both cases, this court makes, I think, a vital distinction between predicate facts at a summary judgment stage. Predicate facts, um, are, uh, the non-movement at the summary judgment stage is the benefit of disputed predicate facts. Once the facts are on the table, and here, a lot of the facts come from video or from the officer's own testimony. There's not, this is a pretty clean record. Um, once you have those facts in place, and I'll, I'll give you a couple examples of this, there's no doubt, um, that the suspect was described as 5'10 when Officer Money was chasing him. There's no doubt that Mr. Bell describes himself as 6'3. Those are predicate facts, and if there were any dispute on those kind of facts, then the non-movement, um, would certainly get the benefit of the doubt. But once you have those predicate facts, there's then a reasonableness inquiry, and the reasonableness inquiry is a question of law, and when deciding that question of law, officers are given wide latitude, um, to make factual, factual inferences on the scene of the crime. And so here, Officer Money, and he was not ignoring these facts. He recognized that he described the suspect as 5'10, and Mr. Bell described himself as 6'3. What's, what's the implications of the difference in the dress, particularly the shorts, which were fairly dramatically different in terms of color? Yes. And the socks? I would, I'd make a couple points. Um, the first is, when you look at this picture, this is the suspect. He's the third person, not this one wearing blue shirts. And again, I'd, I'd encourage you to What page are you on? I'm, I, this is, uh, the exhibit, um What page are you on? Exhibit 18 to plaintiff's, uh, opening brief, or to appellant's opening brief. But what page are you on? Oh, um, 7118, I'm sorry, it's page 101. It's exhibit 18 to the, uh You don't have a page number. It's right at the back. Appellant's brief. I've got some pictures here. I just thought I'd try to find which one you're It's exhibit 18. No, it's the second picture. Exhibit 18 up at the top. And I, and I point this out, Your Honor, um, Judge Smith, because, look, when you look at this picture and when you look at the video What was your, I'm sorry, what was your point about it that you said somebody Your Honor, you'll see three individuals here, and if you look at the video, it's the, it's the individual on the far left who is the suspect. Yeah. Um, and he is about to take off running. When you look at this picture and you look at the video, the color of the suspect's shorts is not clear. And yet, on summary judgment, the district court gave the plaintiff the benefit of the  shorts. In other words, if you look at this picture, this might be a disputed fact if there were a trial down the road as to what color the suspect's shorts are from this video. But the district court assumed, and you can see this in the district court's opinion, he assumed that the shorts and the socks were different. But then when we come back to the reasonableness inquiry that forms the foundation of a probable cause determination, he then has to give the officer some kind of inference. And the officers say, look, we noticed that the shorts were not blue, that Mr. Bell's shorts were not blue. But on the scene, based on their experience and training, and this court said officers can make inferences based on their experience and training in Hanna v. City of Overland. Based on their experience and training, the officers said, we've seen suspects shed clothing in the middle of a foot chase like this, so they can't be identified. And in fact, one of the mistaken identification cases discussed in the briefing here, the case where the suspect had changed clothes in the middle of a foot chase. What about the absence of appearance of recent physical exertion, high physical exertion, the kind that would be needed to run a six-minute mile? Right, Your Honor. It's about seven minutes and one mile from when the suspect, when Munion loses track of the suspect and when Mr. Bell is picked up by Officer Reeserman. And again, I would emphasize that the officers are not ignoring these questions. They're asking these questions. They're discussing these questions on dispatch and on the record. And at the end of the day, they conclude, look, this suspect was extremely fast. Officer Munion can run a six-and-a-half-minute mile without any gear on and was not able to keep up with the suspect. And Mr. Bell is 6'3". I don't know whether he can run a six-minute mile, but the record shows that the suspect was fast. And looking at all the totality of the circumstances, Mr. Bell was within the parameter the officers had set for the search. He was where they expected the suspect to be, north of where they had lost track of the suspect. He was in the right location. And so I think that when you look at the totality of the facts here, that's one of them, but there are a lot of other factors, and the officers considered all of those factors. What was the clothes-changing scenario that they had in mind? That he had another pair of shorts on under these shorts? Yes, Your Honor. They thought he might have been wearing double shorts just in case he was chased? Right, Your Honor. So the suspect is a juvenile carrying a gun. Or were they thinking maybe he went somewhere else and changed in the interim? Right. Like he lived in the neighborhood and went to the house and switched? Right. Would that be more plausible than the double shorts scenario? I think that both are plausible scenarios. I think when you look at Officer Munyon's testimony, he says, look, this happens. We've seen this happen. We're not surprised that it happens. They've seen what happen? They've seen suspects shed clothing, wearing multiple pairs of shorts. They've seen suspects change clothing during the course of a foot chase, as occurred in this case. They specifically said they've seen guys wearing two pairs of shorts in case they're chased, and they take one off? Yes. And you can see this in Officer Munyon's affidavit. And look, if you look at the Oakley case, which is a mistaken identification case from this court, that was an example where the suspect had, in fact, changed clothing in the middle of a foot chase. What do you mean changed? How did he change clothes? You know, it's not clear from the opinion of that case whether it was clothing being worn under other clothing or whether it was... found along the path of escape? No, there was not, Your Honor. I would point out that, well, as Officer Munyon is chasing him, he does see the suspect starting to try to take off his shoes. And my opposing counsel suggests that this undermines Officer Munyon's identification. But in fact, I think it supports it in a couple ways. First, the only reason a suspect takes off his shoes in the middle of a foot chase is presumably to take off clothing. And second, Officer Munyon testified that part of why he thought Mr. Bell was the suspect is because of the unique shoes being worn by the suspect. He said they were black shoes with a streak of red. So when he sees Bell 10 minutes later, thinks, oh, this looks like the suspect. And in fact, one of the reasons why he points to is the description of the shoes. I'd like to point out to a couple other relevant factual points supporting Officer Munyon's judgment and the court's later probable cause finding 48 hours later. One is a discussion of Officer Munyon with the other two juveniles at the scene. Officer Munyon testified, and you can see this, you can see him talking with the other juveniles at the scene of the crime. He says, you know, look, you know, we got him. And the other juvenile says, yeah, we saw you pull up. And the officer, again, takes the inference from this that the other juveniles believe they have the right suspect. And so all of these facts, I think, could add up to probable cause. And that's what the magistrate found out, decided 48 hours later. The question in this case, I think, is a very different one. When police officers have probable cause to arrest the suspect, and they definitely had probable cause to arrest the suspect, the right standard, even for the validity of the arrest, is whether there is a reasonable mistake when they identify someone else instead. And that's the California, the Hill v. California case from the U.S. Supreme Court. And even in that context of a valid warrant, courts give officers significant leeway in their identification. So in Hill... But what about the efforts after the arrest? Even if you have probable cause, once you say you think you got the right guy, what's the standard for evaluation of what the officers do subsequently to verify that, indeed, they have the right person? If just some reasonable investigation, looking at photos, talking to the other arrestees, talking to people at the scene could create doubt as to whether or not the suspect has been detained and there might actually be somebody out there who needs to be found. Right, Your Honor. I think your question goes to the second claim below, which is the substantive due process claim alleging unconstitutional detention. And there, I think the right standard is intentional or reckless failure to investigate. That's a very high bar here. And I don't think... First of all, the officers are not involved past the initial arrest. So that then shifts to the detective, Detective Matavi. And there's simply no evidence in the record of intentional or reckless... But what is the record evidence as to what investigation was done up until the point Matavi decides, well, wait a minute, we should back up? Right, Your Honor. So there's a 48-hour hearing and then there's another later hearing in front of the judge... That's not investigation. No, that's right, where there's this probable cause question. Detective Matavi speaks with Mr. Bell and takes down his testimony. He submits DNA with the consent of Mr. Bell to see if Mr. Bell's DNA matches the DNA on the gun. And then a few weeks later, Detective Matavi determines, based on the video... So there really was no additional investigation subsequent to arrest? Well, it depends what you mean by investigation. There's certainly the DNA question. Well, asking the witnesses at the scene, was this the person who was with you? Asking the other eyewitness, apparently someone who'd made a call, do you recognize this individual? Those kinds of inquiries. Right, let me address both of those. First, the record shows that Officer Munyon did speak with the other juveniles on the scene, and that conversation is in the record, it's on video. Well, my impression was there wasn't really a conversation, there was just kind of an interpretation of the other juveniles' actions. Your Honor, the specific exchange is Officer Munyon says, you know we got him right, the suspect, and one of the juveniles says, yeah, I seen you when you pulled up, end quote. There is a conversation between Officer Munyon and the other juveniles about this very topic. But that doesn't seem to be a specific identification of the person they say they got. Right, I agree that it is not a specific identification. At the time, Officer Munyon took it as one. I think there was a misunderstanding between him and the juvenile. Again, the juveniles did not identify anybody else, and to this day have not identified the suspect. And briefly, if I may, Your Honor, I seem out of time. You can answer the question. You asked about the caller as well. Someone had called in these cops to the scene of the crime, they spoke with the caller on the way to the scene, but as the other two juveniles were being detained, the caller drove by and said some unkind things to the other two juveniles. So the officers chose not to bring the caller back to the scene rather than get involved with that again. So not only I think is there a probable cause for the arrest, but also the qualified immunity standard, every reasonable officer is a very high bar for two of them. Thank you, Mr. Reed. Mr. Benson, you're rebuttal. Yes, Your Honor, all these issues about shoes and changing clothes and everything are addressed in my brief. I want to make one point. Counsel has said the primary reliance was upon the predicate fact of Munyon's eyewitness identification. That's the crux of this case. Everything flows after that. But watch that tape. As his car is coming up, you can hear it go into gear. In three seconds from 30 feet away, he makes a cross-race identification of a suspect that he had not been within 40 feet of when he was chasing, who was looking over his shoulder, who had pulled the gun under the stress of that. Munyon testified in his deposition, he was focusing on the gun as he was trained to do. He wasn't getting a good location. Distance, time, cross-race, stress of a gun, all of those for 40 years have been the hallmark of eyewitness fallibility that this court warns jurors about in its criminal instructions, and they still didn't even mention it. I invited them to mention it, and they didn't even mention it now in this oral argument. They've defaulted that. The predicate identification was without probable cause because of that fallibility on that as well as many other issues, and I thank you for this extra time. Thank you, Mr. Benson. Court, thanks both counsel for the argument you provided to us, which you submitted, and we'll take the case under advisement, render decisions prompt as possible.